**MITCHELL ENERGY CORPORATION,
Petitioner,**

v.

**FEDERAL POWER COMMISSION,
Respondent.**

No. 75–3110.

United States Court of Appeals,
Fifth Circuit.

June 11, 1976.

Homer J. Penn, Houston, Tex., Frank P. Saponaro, Jr., Washington, D. C., for petitioner.

Robert W. Perdue, Deputy Gen. Counsel, Drexel D. Journey, Gen. Counsel, Allan A. Tuttle, Sol., Washington, D. C., for respondent.

Before THORNBERRY, COLEMAN and MORGAN, Circuit Judges.

COLEMAN, Circuit Judge.

The real issue in this case is whether *all* available natural gas reserves in the Pinehurst Field [1] must continue to be delivered to Tennessee Gas Pipeline Company (Tennessee). Mitchell Energy Corporation (Mitchell) contends that only the gas presently being produced from existing wells at designated depths must be so delivered. The Federal Power Commission held against Mitchell's contentions.[2]

The Order of the Federal Power Commission is affirmed.

### Facts

A better grasp of the controversy should follow a chronological recitation of the facts, which run back for a quarter of a century.

*September 13, 1949.* The Gray Wolfe Company made a contract to sell natural gas to Tennessee for interstate transmission. The initial delivery of gas occurred on July 7, 1953. The contract expressly carried an expiration date of July 7, 1973.

The dedication clause of the contract read as follows:

### DEDICATION OF RESERVES

5. (a) Seller [Gray Wolfe] hereby dedicates *to the performance of this agreement* all gas in, under, and that may be produced from Seller's interest in Seller's leaseholds and units from all horizons in the said Pinehurst Field, as described in Exhibit "A" annexed hereto, and from such additional leaseholds and units as Seller shall dedicate as hereinafter provided (emphasis added by the opinion writer).

*September 1, 1954.* The Tennessee-Gray Wolfe contract is filed with the Federal Power Commission.

*December 14, 1954.* The Commission issues a certificate to Gray Wolfe authorizing the sale of gas to Tennessee from Pinehurst Field.[3]

*September 17, 1971. The Commission cancelled the 1954 certificate, cancelled the Gray Wolfe rate schedule, and issued Gray Wolfe a small producer certificate.*

*July 7, 1973.* The Gray Wolfe-Tennessee contract of September 13, 1949 *expires. Only the 1971 small producer certificate remains.*

*June 1, 1974.* Gray Wolfe sells all of its interest in the Pinehurst Field to Mitchell Energy & Development Corporation, which, in turn, assigns its oil and gas interests to Mitchell Energy Corporation, the *petitioner* here.

In the Gray Wolfe purchase, Mitchell

assumes and agrees to fulfill and discharge all expressed and implied covenants and obligations of the leases, assignments, operating and pooling agreements relating to the properties assigned to it herein that may accrue after June 1, 1974, and [Assignee] agrees to fulfill and discharge all of the future obligations which would have been validly imposed on Assignor by any contract, lease, franchise, license, certificate, undertaking or agreement relating to the property or interests hereby transferred and assigned.

*November 6, 1974.* There being no contract with Tennessee, Mitchell files an application for a temporary certificate of public convenience and necessity to sell Pinehurst natural gas to Tennessee, seeking "Commission authorization to continue to provide the same service to Tennessee as was provided by Gray Wolfe, Inc."

*December 12, 1974.* Tennessee petitions for leave to intervene. It opposes Mitchell's application "to the extent that it fails to include all the reserves dedicated to Tennessee by Gray Wolfe".

Tennessee alleged:

Specifically by the Agreement [of 1949], Gray Wolfe committed to Tennessee "all gas in, under, and that may be produced from Seller's interest in Seller's

---

**1.** Montgomery County, Texas.

**2.** Opinion No. 733, June 11, 1975.

**3.** Docket No. G–2649, 14 F.P.C. 1188.

leaseholds and units from all horizons in the said Pinehurst Field, as described in Exhibit "A".

This, of course, makes no mention of the fact that the dedication was expressly measured *by the amount required for the performance of the contract.*

Tennessee further asserted:

"There have been no amendments to the Agreement releasing any of the dedicated acreage. Yet, Mitchell's filing is to continue service only from wells existing when the Agreement terminated and from sands currently producing", and

"The possibility of future development of this acreage which is committed to Tennessee supports Tennessee's request that the acreage remain dedicated to Tennessee so that future exploration and development will benefit the interstate market and, specifically, Tennessee's customers. In addition, Tennessee is contractually entitled to retain the subject acreage under commitment to Tennessee."

*December 31, 1974.* The Federal Power Commission grants a temporary certificate to Mitchell authorizing it to continue natural gas sales to Tennessee at the price of 19 cents per MCF for sales from June 1, 1974 to December 7, 1974. For sales after December 7, 1974, the price was to be 20 cents per MCF. In addition, the Commission reinstates the Gray Wolfe Company Federal Power Commission Gas Rate Schedule No. 1, which it had cancelled September 17, 1971, i. e., the 1954 certificate was reinstated.

*January 8, 1975.* Mitchell notifies the Commission that the temporary certificate is unacceptable and requests reconsideration.

*February 7, 1975.* Petition for reconsideration granted.

*March 17, 1975.* The Commission directs its staff and the parties to file briefs on the following question:

Is Mitchell, as successor to an expired contract to which all the reserves underlying the subject acreage had been dedicated, required under the Natural Gas Act to continue the sale only from certain designated depths from existing wells, or, alternatively, from all depths of all wells drilled or to be drilled on the subject acreage?

*April 2, 1975.* The Commission staff files its brief, contending that

"all gas, whether presently discovered or not, remaining on the acreage now owned by Mitchell was, and still is, dedicated to Tennessee by virtue of the 1949 contract between Tennessee and Mitchell's predecessor in interest".

On the same day Tennessee filed its brief, agreeing with the staff, while Mitchell, of course, strongly disagreed.

*The Commission Opinion and Order*

On June 11, 1975, relying "generally and significantly" on *Sunray Mid-Continent Oil Company v. FPC,*[4] the Commission entered Opinion and Order No. 733.

The Commission held

To conclude, what is controlling is the service that Gray Wolfe was rendering. This does not depend on the continuation of the original contract of 1949, but the contract serves to indicate the type of service that was to be rendered and which was certificated by the Commission. Here the contract plainly included all gas produced from Gray Wolfe's interests in the Pinehurst Field. Gray Wolfe was required to render that service and to continue rendering that service. The small producer certificate issued on September 17, 1971, did not alter the nature of the service and plainly the expiration of the original contract on July 7, 1973, did not do so either. Therefore all sales made or to be made by Mitchell from the Gray Wolfe reserves in the Pinehurst Field are subject or will be subject to the Commission's jurisdiction and Mitchell must continue to sell such gas in inter-

preme Court, Mr. Justices Frankfurter, Harlan, Whittaker, and Stewart dissenting.

state commerce until relieved by action of the Commission under Section 7(b) of the Natural Gas Act.

\*   \*   \*   \*   \*   \*

Mitchell as successor to an expired contract to which all the reserves underlying the subject acreage had been dedicated is required under the Natural Gas Act, to continue the sale of gas to Tennessee from all depths of all wells drilled or to be drilled on the subject acreage.

Mitchell petitioned for rehearing, the petition was denied, and the petition for review followed.

*Sun Oil Company v. Federal Power Commission* [5] was concerned with an expired contract for the sale of natural gas. The Supreme Court recognized that the Federal Power Commission has the authority to issue term certificates of public convenience and necessity; that, in such event, upon expiration of the term the natural gas owner is free to apply for a new certificate authorizing sales under the new contract. The Court concluded, however, that the certificate in controversy was a permanent one. Neither the application nor the certificate referred to a limitation. In the case presently under review there is no contention that the Gray Wolfe-Tennessee application and certificate of 1954 had any such references. We accordingly follow *Sun Oil* and assume that there was none.

We are thus remanded to the teachings of *Sunray Oil v. FPC, supra.*

Although the Gray Wolfe-Tennessee contract antedated *Sunray* by about eleven years, *Sunray* nevertheless controls because the Act, from its inception, controlled, *Weymouth v. Colorado Interstate Gas Company*, 5 Cir., 1966, 367 F.2d 84; *Mississippi River Fuel Corporation v. Federal Power Commission*, 8 Cir., 1941, 121 F.2d 159.

*Sunray* held:

During its [the contract] term, both parties are bound by it to the same extent as any members of this regulated industry. When it expires, petitioner, to be sure, will be under an obligation to continue to deliver gas to United on the latter's request unless it can justify abandonment before the Commission . . . . The obligation that petitioner will be under after the contract term will not be one imposed by the contract but by the Act. It will be free then, as it was not free during the contract term . . . to make rate changes under [Section] § 4 without United's consent. 364 U.S. at 155, 80 S.Ct. at 1402, 4 L.Ed.2d at 1635.

*The Court further held that once natural gas is dedicated to interstate commerce that gas may not be withdrawn from continued interstate movement without Commission approval,* 364 U.S. at 156, 80 S.Ct. at 1403, 4 L.Ed.2d at 1636.

### The Decision

From the foregoing we are convinced that by its 1954 certificate Gray Wolfe dedicated all available gas in the Pinehurst Field to interstate commerce. Mitchell has assumed Gray Wolfe's obligations. Thus, until relieved of that obligation by appropriate action of the Commission, Mitchell must continue to put in interstate commerce all the gas produced in the Pinehurst Field. See, also, *United Gas Pipe Line Company v. Federal Power Commission*, 5 Cir., 1965, 350 F.2d 689, affirmed, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181.

We need not decide the correctness of the Commission staff opinion that the 1949 contract-1954 certificate "dedicated the gas to Tennessee". In the present status of the case, all this is beside the point. On the record before us, the gas has been dedicated to interstate commerce, it may not be withdrawn without Commission approval, and Tennessee alone has the facilities by which it may be utilized in interstate commerce. That is the sum total of the matter as it presently stands. We, of course, shall not indulge in any dicta on "what if", or hypothetical, propositions which may never oc-

---

**5.** 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639, rehearing denied, 364 U.S. 856, 81 S.Ct. 32, 5 L.Ed.2d 80 (1960).

cur. We are not allowed the luxury of advisory opinions.

### The Rate Issue

In conclusion, we find Mitchell's arguments concerning the rate prescribed by the Commission to be without merit, see, e. g., *Federal Power Commission v. Hunt,* 376 U.S. 515, 523, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); *Atlantic Refining Company v. Public Service Commission,* 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312.

The other contentions raised here by Mitchell were not presented to the Commission, *Sunray, supra,* 364 U.S. at 156–157, 80 S.Ct. at 1403–1404, 4 L.Ed.2d at 1636–1637, 15 U.S.C. § 717r(b).

Opinion and Order No. 733, dated June 11, 1975, is

AFFIRMED.